**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4675-16T3

BRENDA LEE VARELLI,
KYLE A. BRADFORD,
LYLE J. BRADFORD, and
ESTATE OF JANET E.
BRADFORD, as a nominal
plaintiff,

       Plaintiffs-Respondents/
       Cross-Appellants,

v.

JENNIFER WHITE, JACQUELYNE
MCGLINCHEY, FIDELITY ESTATE
PLANNING, LLC, ADAM BAALS, CEO,
and ADAM BAALS, individually, and
MELODIE WHITE,

       Defendants,

and

DONALD L. KINGETT, ESQ.,
RABIL, ROPKA, KINGETT &
STEWART, LLC, and RABIL,
KINGETT & STEWART, LLC,

       Defendants-Appellants/
       Cross-Respondents,

_____

Argued February 28, 2019 – Decided July 18, 2019

Before Judges Simonelli, Whipple and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Docket No. L-1405-11.

John L. Slimm argued the cause for appellants/cross-respondents (Marshall Dennehey Warner Coleman & Goggin, attorneys; John L. Slimm, on the briefs).

Jeffrey V. Puff argued the cause for respondents/cross-appellants (Puff & Cockerill, LLC, attorneys; Jeffrey V. Puff, on the briefs).

PER CURIAM

Defendants Donald L. Kingett, Esquire, Rabil, Ropka, Kingett and Stewart, LLC, and Rabil, Kingett and Stewart, LLC appeal, and plaintiffs, Brenda Lee Varelli, Kyle A. Bradford, and Lyle J. Bradford cross-appeal from a jury verdict rendered on April 2, 2016 finding Kingett deviated from the standard of care required of an attorney which was a proximate cause of losses sustained by plaintiffs in this estate and negligence case. Defendants also appeal from a May 2, 2016 order denying their motion for a judgment notwithstanding the verdict, and all parties appeal the award of counsel fees to plaintiffs. For the reasons that follow, we reverse and remand for a new jury trial.

I.

On June 23, 2008, plaintiffs filed a verified complaint and order to show cause (OTSC) in the Probate Part in connection with the estate of their mother (decedent) who died on February 6, 2008.[1] She executed Wills in 1996 and 2007. The complaint alleges that in September 2007, decedent had diminished capacity and was unduly influenced to change her estate plan by her granddaughter, Jennifer White, her primary caretaker. The judge entered plaintiffs' OTSC placing restraints on the estate's real and personal assets.

Decedent was diagnosed with Alzheimer's disease and dementia. She had four children: Brenda, Lyle, Kyle, and Melodie, who is Jennifer's mother. The decedent's original 1996 Will provided for a four-way equal distribution of her assets to her children. Because decedent lacked cognitive ability, a previous attorney advised Brenda, Jennifer, and Kyle to file a guardianship action and he declined to prepare a power-of-attorney (POA) as requested by plaintiffs because of decedent's condition. A guardianship action was never pursued.

In March 2007, decedent fell in her home and was transported to Cooper Hospital where she was again diagnosed with dementia and later transferred to

---

[1] Parties who share a last name with other parties are referred to by their first names for the ease of reference. By doing so, we intend no disrespect.

A-4675-16T3

ManorCare. After being released on April 12, 2007, she went home and the White family resided with her in conditions described by Brenda as a "pigsty."

After decedent's prescription medication insurance expired in April 2007, Jennifer sent a letter to decedent's insurance company asking for reinstatement of her prescription medication insurance because her grandmother was "slowly slip[ping] away into Alzheimer's." In May 2007, Dr. John Gartland was treating decedent for dementia and Alzheimer's disease. By July 2007, decedent was deteriorating mentally, thought she was a student, could not hold a thirty-second conversation, and became a "shell" of a person according to Brenda.

On July 16, 2007, Jacquelyne McGlinchey a self-employed estate planner affiliated with Fidelity Estate Planning, LLC (FEP), met with decedent at her home. Plaintiffs argue that McGlinchey was a "salesperson" who signed up elderly clients for "estate planning." Ostensibly, decedent expressed to McGlinchey that she wanted Jennifer to inherit her estate because she cared for her and decedent's own children did nothing for her. McGlinchey believed decedent was competent because she freely answered questions. Based upon her observation of decedent, McGlinchey had her execute an estate planning services contract. McGlinchey created a client workbook and recorded information about decedent. At a later time, McGlinchey changed her story and

4

testified that decedent could not understand one hundred percent of what they discussed.

McGlinchey recommended placing decedent's home into a revocable living trust (RLT), naming decedent and Jennifer as co-trustees, and establishing life estates for Woodrow and William, Jennifer's brothers, and Melodie. The RLT was recommended to avoid probate, and Jennifer would be named executrix, POA, and appointed as decedent's health care representative. After the initial meeting, McGlinchey provided attorney Kingett (defendant) with her client workbook. Thereafter, Kingett prepared a retainer agreement that provided his legal services would include "a personal interview, either in [defendant's] office . . . or via telephone to discuss [the client's] estate plan." The retainer specified certain limitations on the scope of legal representation. For example, defendant would not supervise the execution of legal documents unless decedent appeared in his office. The retainer agreement also included information about FEP's services. Decedent paid FEP a total of $1695, $450 was defendant's fee. The remaining $1245 was shared between McGlinchey and Adam Baals, who served as the chief executive officer (CEO) of FEP.

On July 31, 2007, decedent purportedly signed the retainer agreement, but defendant later conceded he did not know whether she personally signed it or if

somebody else signed it on her behalf. Defendant never discussed any limitations of his representation with decedent.

On August 1, 2007, decedent purportedly signed an application to purchase an annuity naming Jennifer and Melodie as beneficiaries. Thereafter, McGlinchey invested decedent's assets into annuities with Old Mutual and shared the commissions with Baals. Plaintiffs allege defendant and Baals formed FEP "to sell to unsuspecting clients unnecessary revocable trusts and annuities to generate legal fees and large commissions."

Defendant ostensibly spoke to decedent on August 18, 2017, over the telephone for eight minutes about revising her estate plan, but he never met with her in person. He conceded that since he never met her or knew her personally, and he could not confirm he actually spoke to her. According to Jennifer, defendant called decedent on a cellular phone while Jennifer listened in on a speaker phone. He drafted a new Will and RLT naming defendant and Jennifer as trustees, a healthcare directive, and a living Will. Upon decedent's death, the four members of the White family would each receive twenty percent of her estate, and Brenda, Kyle, and Lyle would share the remaining twenty percent.

Defendant claims he asked decedent if she wanted to meet him at his office or if she preferred to have the documents sent to her home. During that brief

phone call, defendant claimed that he reviewed with decedent all matters relevant to her estate, including her Will, RLT, POA, and health care directive. Defendant described decedent as sounding like an older female who was clear and concise. After the trial, it was revealed that the person speaking on the phone to defendant was not the decedent but was actually her daughter Melodie.

On September 18, 2007, McGlinchey again went to decedent's home and notarized her testamentary documents purportedly in the presence of two witnesses, a neighbor, and McGlinchey's spouse. In the early stages of the litigation, McGlinchey contended that on that day, decedent was incapable of signing because she was incoherent, and Jennifer signed the documents, as well as the earlier executed retainer agreement. In December 2007, Jennifer informed plaintiffs that decedent's estate plan had changed. Decedent passed away on February 6, 2008. Brenda, Kyle, and Lyle each received a $5000 check from Jennifer.

Plaintiffs amended their complaint on October 23, 2008, adding allegations against Jennifer, McGlinchey, Melodie, FEP, and defendant claiming they participated in a "trust mill." In 2008 and 2009, plaintiffs amended their complaint to add allegations against defendant and his law firm,

Rabil, Kingett & Stewart, LLC[2] (collectively, defendants). In April 2010, plaintiffs again amended their complaint to add claims against Baals, in his capacity as CEO of FEP (collectively, with the financial planner and the financial planning company, financial defendants).

On March 24, 2011, the probate judge sua sponte appointed Brenda Lee Eustler, an attorney, as administrator of decedent's estate, and the judge ordered the probate matter be severed from the professional negligence and other claims against defendants and the financial defendants. These claims were transferred to the Law Division. At the summary judgment hearing on July 29, 2011 in the Probate Part, the judge found decedent lacked testamentary capacity to revise her estate plan and Jennifer unduly influenced her with respect to estate documents decedent executed.

At the September 26, 2011 trial, Jennifer and the financial defendants did not appear; the probate court made a final determination that in September 2007, decedent had diminished capacity and was unduly influenced by Jennifer. The probate court nullified the decedent's 2007 estate planning documents and

---

[2] Formerly known as Rabil, Kingett, Ropka & Stewart, LLC.

ordered Jennifer to return the assets she confiscated to the estate.[3] The 1996 Will was not probated and the judge distributed the assets in accordance with the intestacy statute, N.J.S.A. 3B:5-4, resulting in a $256,298.61 recovery for plaintiffs. The judge awarded plaintiffs $156,073.30 in counsel fees. This determination is not challenged on appeal.

On September 28, 2011, defendants filed for summary judgment in the Law Division. As of June 2012, Baals was still offering estate planning services with defendant providing legal representation to Baal's clients. On June 5, 2012, the judge partially granted defendants' motion, dismissed plaintiffs' consumer fraud claims[4] against defendants, and named the estate as a nominal plaintiff. In so doing, the judge stated:

> [O]nly [Eustler] as the administrator for the estate can decide whether to participate as an active plaintiff prosecuting the claims put forth by [plaintiffs] . . . . [Eustler] is the decision maker and personification of the [e]state; she alone is charged with deciding what litigation to pursue[.]
>
>     . . . .
>
> [Eustler] has provided no response or input into the present motions. This court has no idea what her

_____

[3] The record indicates that Jennifer filed a petition in bankruptcy at some point during these proceedings.

[4] N.J.S.A. 56:8-1 to -20.

position may be . . . .  Since she is the decision maker[,] . . . this court must respect her decision to stay in a neutral position.

. . . .

Notwithstanding the above, it is clear that this litigation will directly affect and impact the [e]state.

. . . .

This court finds the estate an indispensable party.

. . . .

Under [Rule] 4:28-1, joinder of the [e]state is generally as plaintiff, but if the [e]state refuses, the entity may be joined as a defendant.  The court directs [Eustler] within [fifteen] days . . . [to] indicate whether she is refusing to be joined as a nominal plaintiff . . . .  If no "refusal" is timely filed[,] then the estate shall be included as a nominal party plaintiff but with the estate not being construed to be adopting the affirmative claims pursued by [plaintiffs].

. . . .

Until [Eustler] indicates on her own application to this court, the [e]state will be a nominal party plaintiff not directly pursuing [plaintiffs'] claims.

In July 2012, plaintiffs amended their complaint to add Baals as a defendant in his individual capacity.  On November 18, 2012, the judge ruled that the parties were collaterally estopped from re-litigating matters determined by the probate court.  On January 30, 2013, plaintiffs filed a motion seeking to

10

void defendant's limited scope retainer agreement; the judge denied the motion, stating that the validity of the retainer agreement was a fact question for the jury.

On January 30, 2015, McGlinchey signed an affidavit stating that decedent was not competent when the testamentary documents were signed, and that Jennifer unduly influenced her grandmother. Eustler originally determined the value of the estate's assets were as follows:

- Decedent's residence          -          $169,700

- Individual Retirement
  Account (IRA) and cash          -          $231,530.14

- Life Insurance annuities          -          $222,044.58

The sale of the residence yielded only $86,920, the sale of the qualified annuities was $118,378.61, and the sale of the nonqualified annuities amounted to $51,000 instead of the projected $113,653.92 Thus, the total amount Eustler received for the estate was $256,298 and plaintiffs recovered this amount. The loss to the estate was approximately $200,000. In her 2015 certification, Eustler clarified that she chose not to bring an action on behalf of the estate to avoid further depleting the estate's assets, given plaintiffs brought the action and they were authorized to do so.

On February 12, 2015, plaintiffs filed a motion in the Law Division requesting the judge confirm the allocation of damages and counsel fees. The

11

motion was denied because the judge ruled the issue of allocation would have to abide by the jury's verdict. On March 27, 2015, plaintiffs amended their complaint.

On May 6, 2015, the parties stipulated that plaintiffs' compensatory damages were $244,000 and, following the jury verdict, the court would mold the verdict and apportion the percentages of liability for each party. Plaintiffs moved for leave to file and serve a seventh amended complaint, seeking to add a count asserting a joint enterprise, which was granted on June 8, 2015. On September 18, 2015, defendants moved for partial summary judgment seeking to dismiss the joint enterprise count, which was denied on March 3, 2016.[5]

In the interim, defendants made an offer of judgment[6] on November 4, 2016, for $244,000, inclusive of costs and fees, which plaintiffs rejected. Two days later, plaintiffs moved to amend the status of the estate from a nominal to a formal plaintiff. Eustler certified that she authorized plaintiffs to litigate any claim that the estate could have brought. Defendants cross-moved to disqualify plaintiffs' counsel because of a purported conflict of interest in his representing

---

[5] The order was incorrectly dated 2015.

[6] R. 4:58-1 to -6.

both plaintiffs and the estate, and in response, plaintiffs withdrew their motion to name the estate as a formal plaintiff.

On March 8, 2016, the judge denied plaintiffs' motion for summary judgment on the issue of whether defendant deviated from acceptable standards of legal practice. On March 30, 2016, the judge denied plaintiffs' request to amend their complaint to add a count asserting that an agency relationship existed between defendant and the financial defendants.[7]

In limine, the judge ruled that plaintiffs had a right to rely on defendant to conform with the standard of care in his profession; whether the retainer agreement was enforceable as to plaintiffs, who were not clients, was a fact question for the jury to determine; civil conspiracy could be presented to the jury;[8] and any liability attributable to defendant would also be attributable to his law firm. The judge dismissed plaintiffs' breach of fiduciary duty claim, finding that plaintiffs did not sustain their burden of proof on that issue.

Vincent Micciche, an expert in financial services, testified at trial that there was a fiduciary relationship between the financial defendants and

---

[7]  As a result of a settlement, Melodie was dismissed from the case.

[8]  The civil conspiracy claim was later voluntarily dismissed.

A-4675-16T3

decedent. Micciche also testified that when McGlinchey recognized that decedent lacked testamentary capacity to sign the documents, McGlinchey should have brought the matter to her supervisor.

Plaintiffs' expert on the issue of elder law and estates, Thomas D. Begley, III, Esq., opined at trial that all attorneys are required to demonstrate a reasonable degree of knowledge and skill; but a specialist in a specific area of the law is held to a higher standard, citing Cellucci v. Bronstein, 277 N.J. Super. 506 (App. Div. 1994). Here, defendant held himself out as a specialist in estate planning.

Begley cited to the New Jersey Rules of Professional Conduct (RPC) as well as the Model Rules of Professional Conduct (MRPC), which provide objective standards against which attorney conduct can be measured. According to Begley, when an attorney undertakes a duty to one other than his client, he may be liable for damages caused by a breach of that duty, citing Stewart v. Sbarro, 142 N.J. Super. 581 (App. Div. 1976); lawyers also have a duty to a non-client when the lawyer knows that his or her client intended the lawyer's services to benefit a non-client, citing Restatement (Third) of The Law Governing Lawyers § 51 (Am. Law Inst. 2000). Defendant's deposition testimony indicated that in his practice, he generally complied with the standard of care applicable

to estate attorneys by meeting with his clients without others present, confirming that the estate plan represented the wishes of the testator, explaining documents, and supervising the execution of documents.

Begley opined that defendant deviated from his own general practice with respect to decedent since he could not attest to her competency or conclusively identify that she was the person he spoke to on the phone, he could not screen for the presence of undue influence, had no knowledge as to who was with her during the telephone conversation, he could not have adequately explained everything to her during the short phone call, and he failed to explain or oversee execution of the documents. Begley cited MRPC 1.3 and 1.4, RPC 1.4, and Ziegelheim v. Apollo, 128 N.J. 250 (1992), which all require a lawyer to keep a client informed and he testified defendant failed to do so here. Also, RPC 5.3 requires proper supervision of non-lawyers, and Begley opined that defendant failed to supervise McGlinchey. In addition, RPC 5.4 prohibits an attorney from sharing fees with a non-lawyer, and defendant shared fees with FEP.

According to Begley, RPC 1.2 permits a limited scope retainer when the client gives informed consent, but defendant's limited scope retainer agreement was improper because it provided that defendant would not explain documents

or supervise their execution. And, defendant did not make the relatively simple attempt to ascertain whether decedent had capacity.

Begley relied upon the following facts relevant to his conclusion that defendant had not met the standard of care for an estates attorney: defendant held himself out as an expert on estate matters; the phone call to decedent lasted only eight minutes; defendant could not ascertain that he was speaking with decedent; defendant did not supervise the execution of the documents; defendant ratified McGlinchey's actions by relying on her to obtain information at the initial meeting with decedent; decedent did not provide informed consent for defendant's limited representation; defendant did not determine whether decedent had capacity; and the attorney at the prior law firm understood that decedent needed a guardianship because she had Alzheimer's.

Begley cited cases from other jurisdictions including Biakanja v. Irving, 320 P.2d 16, 19 (Cal. 1958) (holding whether a defendant is liable to third person not in privity involves balancing of various factors, including the extent to which the transaction was intended to affect plaintiff, foreseeability of harm to him, the degree of certainty that plaintiff suffered injury, closeness of connection between the defendant's conduct and injury suffered, moral blame attached to the defendant's conduct, and a policy of preventing future harm), and Lucas v.

Hamm, 364 P.2d 685, 689 (Cal. 1961) (where attorney negligently prepared Will, beneficiaries were entitled to recover as third-party beneficiaries). Begley also cited Rathblott v. Levin, 697 F. Supp. 817, 819 (D.N.J. 1988) (discussing whether an attorney who drafts a Will could invoke lack of privity as a defense where his negligence caused a beneficiary to spend funds defending a Will contest).

Glenn A. Henkel, Esq., defendants' expert in estate planning and administration, and a former colleague at a law firm where both he and defendant were employed, opined defendant met the standard of care for any attorney with respect to decedent, and defendant owed no duty of care to plaintiffs. Henkel also opined an attorney's violation of an RPC does not constitute malpractice per se, and that McGlinchey properly notarized the document, even if the witnesses did not see decedent sign it. Henkel testified that an attorney does not need to meet a client face-to-face. Henkel testified that defendant could have adequately reviewed with decedent all of the relevant information in an eight-minute phone call.

Following a nine-day trial, the jury returned a verdict in plaintiffs' favor, finding that defendant deviated from accepted standards of professional care, and his negligence proximately resulted in twenty-five percent of plaintiffs'

17

damages. Seventy-five percent of liability was allocated amongst the other defendants. The jury also found Jennifer and the financial defendants breached their fiduciary duties to the estate, committed consumer fraud and common law fraud, and they, along with defendant, participated in a joint enterprise. The judge entered judgment against the financial defendants for consumer fraud, including treble damages and attorney's fees.

Defendants timely moved for a judgment notwithstanding the verdict (JNOV),[9] attorney's fees, and costs. Thereafter, plaintiffs requested fees in the amount of $1,053,137.[10] Defendants filed opposition and argued the sum of $901,929.60 was improperly billed, reducing the amount of fees for consideration to $103,543.65.

On August 31, 2016, the judge granted defendants' motion for a stay pending appeal; and the following day, he denied defendants' motion for JNOV, ruling that the issue of joint enterprise was properly submitted to the jury. In the final judgment order dated March 1, 2017, the judge reconsidered and determined the evidence did not support the jury's finding of joint enterprise and

---

[9] R. 4:40-2.

[10] Plaintiffs' billing statement exceeded 800 pages and is not included in its entirety in this appendix.

the issue should not have been submitted to the jury. That same day, the judge entered a final judgment against defendants comprised of $61,000 in damages, $534,756 in counsel fees, and against the financial defendants in excess of $1 million each. The judge allocated damages and counsel fees in accordance with the percentages assigned by the jury amongst the defendants.

Plaintiffs filed a motion for reconsideration under Rule 4:49-2 with respect to the joint enterprise ruling, which was denied on April 13, 2017. In his opinion, the judge stated: "I will note for the record that my decisions with regard to the joint enterprise issue and how I finally handled it and the judgment are inconsistent." On May 22, 2017, the judge denied a motion to vacate the final judgment against Baals. On July 7, 2017, nunc pro tunc to April 20, 2016, the judge denied defendants' motions for involuntary dismissal and for judgment.

On appeal, defendants argue that the judge erred in: finding plaintiffs had an attorney-client relationship with defendant, granting plaintiffs leave to file and serve a seventh amended complaint to assert a theory of joint enterprise, and thereafter, denying defendants' motion for summary judgment seeking to dismiss that claim, and denying defendants' motions for involuntary dismissal and JNOV.

In their cross-appeal, plaintiffs argue the judge erred in: dismissing the estate's claim for breach of fiduciary duty to decedent; dismissing the claim of joint enterprise by acting as a seventh juror; improperly allocating damages and fees; and not declaring the retainer agreement void as a matter of law on summary judgment. The award of attorney's fees is challenged by defendants and plaintiffs.[11]

## II.

We first examine the dismissal of the breach of fiduciary claim. Lawyers owe a fiduciary responsibility to their clients. Cohen v. Radio-Elecs. Officers Union, 146 N.J. 140, 155 (1996). "The attorney-client relationship is a fiduciary one, involving the highest trust and confidence." In re Brown, 88 N.J. 443, 448 (1982). An attorney's fiduciary role requires that he or she attend to and look out for the client's best interests. Estate of Spencer v. Gavin, 400 N.J. Super. 220, 242 (App. Div. 2008). Although New Jersey law imposes duties of fairness, good faith, and fidelity upon all fiduciaries, "an attorney is held to an even higher degree of responsibility in these matters than is required of all others." Ibid. (quoting In re Honig, 10 N.J. 74, 78 (1952)).

---

[11] At oral argument, we permitted both counsel to submit post-argument briefs as to the applicability of our recent decision in Jacobs v. Mark Lindsay & Son Plumbing & Heating, Inc., 458 N.J. Super. 194 (App. Div. 2019).

In F.G. v. MacDonell, 150 N.J. 550, 563 (1997), a clergy malpractice case, our Supreme Court described a fiduciary relationship as follows:

> The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship.

However, "[t]he exact limits of the term 'fiduciary relation' are impossible of statement. Depending upon the circumstances of the particular case or transaction, certain business, public or social relationships may or may not create or involve a fiduciary character." Id. at 564 (alteration in original) (quoting Bogert, Trusts and Trustees § 481 (2d ed. 1978)). "The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care. Accordingly, the fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship." Ibid. (citation omitted).

The Restatement (Second) of Torts § 874 (Am. Law Inst. 1979) provides: "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." A breach of fiduciary duty is a tort. Ibid. At common law, certain torts were considered personal, such as invasion of privacy and libel and they did not

21

survive the death of the person who had been damaged by the tortfeasor. <u>Weller</u> <u>v. Home News Pub. Co.</u>, 112 N.J. Super. 502, 506-07 (Law Div. 1970). However, that changed with the passage of the "survival statute," N.J.S.A. 2A:15-3, which provides, in pertinent part, as follows:

> Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living.

Further, "[a] personal representative may ratify and accept acts on behalf of the estate done by others where the acts would have been proper for a personal representative." N.J.S.A. 3B:10-20.

<u>Restatement (Third) of Agency</u> § 4.01 (Am. Law Inst. 2006) provides:

> (1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.
>
> (2) A person ratifies an act by
>
> > (a) manifesting assent that the act shall affect the person's legal relations, or
> >
> > (b) conduct that justifies a reasonable assumption that the person so consents.

Generally, an attorney is not liable to third parties who are not his or her clients for negligence in the performance of professional duties. <u>Stewart</u>, 142

22

N.J. Super. at 593. But where an attorney assumes a fiduciary obligation, the attorney has a duty to others who the attorney has or should have reason to believe would be relying on him. Ibid. The determination of whether the duty undertaken by an attorney extends to a third party not in privity with the attorney involves a balancing of factors such as: (1) "the extent to which the transaction was intended to affect the plaintiff"; (2) the foreseeability of harm to the plaintiff; (3) "the degree of certainty that the plaintiff suffered injury"; (4) "the closeness of the connection between the defendant's conduct and the injury suffered"; (5) "the moral blame attached to the defendant's conduct"; and (6) "the policy of preventing future harm." Ibid. (quoting Biakanja, 320 P.2d at 16).

Applying the Stewart factors here, the following considerations may be drawn by the fact-finder: (1) defendant's drafting of decedent's Will was intended to benefit the beneficiaries of the Will, i.e., plaintiffs; (2) it was foreseeable that drafting a Will for a person that lacked capacity and was unduly influenced would cause harm to plaintiffs; (3) it was a certainty that plaintiffs suffered harm inasmuch as the parties stipulated that the estate lost $244,000 and plaintiffs had to engage in costly, protracted litigation to recover those assets; (4) there was a connection between defendant's drafting of the Will and

the loss to the estate, but it is unclear how close the connection was, given that Jennifer, an intentional tortfeasor, depleted the assets of the estate; (5) it is unclear whether moral blame should be attached to defendant's conduct, given that Jennifer was the primary reason why the estate suffered a loss; and (6) it is unclear how this matter would affect the policy of preventing future losses. We conclude it is a fact question for the jury as to whether defendant breached his fiduciary duty here.

Plaintiffs argue that we should exercise original jurisdiction and find that defendant breached his fiduciary duty to the estate and the beneficiaries. We decline to do so because whether defendant breached his fiduciary duty is a fact question for the jury and will be determined on remand.

Plaintiffs further argue that the improper dismissal of their breach of fiduciary duty claim resulted in: defendant not being responsible for the entire amount of the compensatory damages and the reasonable attorney's fees; the jury not assigning a higher percentage of liability to defendant; and a lower award of fees. A finding by the jury that defendant breached his fiduciary duty might affect the jury's allocation of liability and the court's award of fees.

Plaintiffs argue the judge agreed defendant had a fiduciary duty to decedent, but erred in dismissing that claim prior to trial because they were

authorized by Eustler to bring claims against defendants on behalf of the estate. We agree. The judge acknowledged that Eustler validly transferred the estate's rights to plaintiffs to pursue claims against defendants, stating:

> [P]laintiffs have stood in the shoes of the estate throughout the litigation. [Eustler], the appointed administrator, . . . could not make clearer . . . that "plaintiffs in this matter have been authorized by [her] to bring all of the claims that the [e]state can make against any and all of the defendants in this litigation."
>
> [(Third alteration in original).]

The judge found Eustler's authorization was valid with respect to pursuing the legal malpractice claim, but he improvidently analyzed the breach of fiduciary duty claim. Although finding defendant owed a fiduciary duty to decedent, the judge held nothing in the record indicated plaintiffs knew defendant or that they personally placed trust and confidence in him; therefore, the judge concluded plaintiffs could not bring a claim against defendant for breach of fiduciary duty. We disagree.

In Petrillo v. Bachenberg, 139 N.J. 472, 482-85 (1995), our Supreme Court held that an attorney owes an independent duty of care to a non-client when the attorney "intended or should have foreseen that the [non-client] would rely on the [attorney's] work" or when the attorney "know[s], or should know, that non-clients will rely on the attorney['s] representations and the non-clients

25

are not too remote from the attorney[] to be entitled to protection." To sustain a malpractice claim, a non-client must show reliance on the attorney's actions or representations was reasonably foreseeable by the attorney, as it is the reasonably foreseeable reliance by the non-client on the attorney's representation that imposes the duty of care. Id. at 483-84. As our Supreme Court further clarified in Banco Popular North America v. Gandi, 184 N.J. 161, 180 (2005):

> If the attorney['s] actions are intended to induce a specific non-client['s] reasonable reliance on his or her representations, then there is a relationship between the attorney and the third party. Contrariwise, if the attorney does absolutely nothing to induce reasonable reliance by a third party, there is no relationship to substitute for the privity requirement.

We "review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The evidence must be viewed in "the light most favorable to the non-

moving party[.]" Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 524 (2012).

Determining whether there is a genuine issue for trial "does not require a court to turn a blind eye to the weight of the evidence; the 'opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" Triffin v. Am. Int'l Grp., Inc., 372 N.J. Super. 517, 523-24 (App. Div. 2004) (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)). Opposition to a motion for summary judgment requires "competent evidential material" beyond mere "speculation" and "fanciful arguments[.]" Merchs. Express Money Order Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005). To survive summary judgment, the opposing party must, with the benefit of all favorable inferences, show a rational factfinder could determine the plaintiff met her burden of proof. Globe Motor Co. v. Igdalev, 225 N.J. 469, 481 (2016).

Thus, even though there was no retainer agreement between plaintiffs and defendant, summary judgment on this issue was properly denied and the issue was appropriately submitted to the jury because Eustler authorized plaintiffs to bring such a claim on behalf of the estate. The judge inexplicably departed from Eustler's assignment of claims that plaintiffs could pursue by dismissing their

breach of fiduciary duty claim. The judge erred by concluding the breach of fiduciary claim was not proven because defendant presumably did not actually handle decedent's assets. Therefore, we reverse the judge's ruling and remand for a new trial, and the breach of fiduciary claim shall be submitted to the jury for a determination.

III.

We next address defendants' argument that the judge erred by granting plaintiffs leave to file and serve a seventh amended complaint to assert a theory of joint enterprise, and denying defendants' motion for summary judgment seeking to dismiss that claim.

In June 2015, the judge permitted plaintiffs to file a seventh amended complaint adding an allegation for joint enterprise, and the judge subsequently denied defendants' motion seeking to summarily dismiss the seventh count. The jury ultimately found a joint enterprise existed between defendant, Jennifer and the financial defendants. Initially, the judge denied defendants' motion for JNOV on the joint enterprise issue. But in March 2017, when rendering final judgment, the judge stated that even though he was initially persuaded by the joint enterprise argument, he now concluded that the allocation of responsibility among the defendants should instead be guided by the principles enunciated in

Blazovic v. Andrich, 124 N.J. 90, 106-12 (1991), and Grubbs v. Knoll, 376 N.J. Super. 420, 431 (App. Div. 2005), i.e., that liability should be imposed in proportion to fault, and not jointly and severally. The judge reasoned that even though defendant might have had some control over McGlinchey, he had no control over Jennifer, "the dominating force in the perfect storm[.]" Thus, the judge determined that defendant should not be held jointly and severally responsible for all damages and attorney's fees, given that Jennifer's undue influence was a significant factor in causing the damages.

A trial court has broad discretion to permit an amendment to pleadings, and such discretion should be liberally construed. Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 437, 456-57 (1998). When an issue has been injected into the case even in a deficient manner, the opposing party will be deemed to have been on notice that the issue is included in the matters to be resolved. Winslow v. Corp. Express, Inc., 364 N.J. Super. 128, 140-41 (App. Div. 2003) (quoting Teilhaber v. Greene, 320 N.J. Super. 453, 466 (App. Div. 1999) ("[A] 'deficient' complaint that omits a specific legal theory may be remedied at trial by showing the appropriate proofs for the omitted theory."); 68th St. Apts., Inc. v. Lauricella, 142 N.J. Super. 546, 561 n.3 (Law Div. 1976)

29

(noting that even when theory was not advanced in pleadings, it is properly before the court if it was fully aired at trial and in post-trial briefs).

A motion to amend pleadings pursuant to Rule 4:9-1 should be freely granted by the court so long as no prejudice results to the non-moving party. Zacharias v. Whatman PLC, 345 N.J. Super. 218, 226 (App. Div. 2001). However, when the motion is filed late and lacks apparent merit, the court generally denies it. Fox v. Mercedes-Benz Credit Corp., 281 N.J. Super. 476, 483 (App. Div. 1995).

Defendants argue the judge erred in permitting plaintiffs leave to file and serve a seventh amended complaint because the judge had already denied their request that defendants be held jointly and severally liable, and the seventh amended complaint was actually a motion for reconsideration in the guise of a motion to amend the pleadings. We disagree.

Here, defendants have shown no prejudice that resulted from the subject amendment. Moreover, the judge noted that the issue of joint enterprise had already been injected into the case and had been discussed long before the court permitted the amendment to the pleadings. Further, when the judge denied plaintiffs' motion for a ruling on joint and several liability, it noted that its "[d]ecision as to [the] extent of liability, joint [and] several, has to await [the]

jury verdict." This holding was not contradicted by the court's subsequent permission for plaintiffs to amend the pleadings to include a count for joint enterprise.

A joint enterprise is an undertaking described in <u>Restatement of the Law (Second) of Torts</u> § 876 (Am. Law Inst. 1979):

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> > (a)   does a tortious act in concert with the other or pursuant to a common design with him, or
> >
> > (b)   knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> >
> > (c)   gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

The judge erred here in setting aside the jury finding of a joint enterprise. Whether defendants conspired to revise decedent's estate planning to change her original intent to leave her assets equally to her four children, and whether defendants worked in concert to generate unnecessary fees is a question of fact for the jury. On remand, we direct the judge to allow the seventh amended

31

pleading on the theory of joint enterprise to stand and the issue to be presented to the jury.

IV.

Plaintiffs argue in their cross-appeal that because the court should not have dismissed the breach of fiduciary duty claim, the jury's allocation of liability for damages was incorrect.

The jury found the financial defendants and Jennifer breached their fiduciary duties to decedent, and committed other torts, and determined that those parties were liable for seventy-five percent of the estate's losses. The jury found that defendants had committed legal malpractice and were liable for twenty-five percent of the losses to the estate, but, as noted, did not consider whether defendant had breached his fiduciary duty to decedent.

The Comparative Negligence Act requires a fact finder to apportion liability amongst numerous tortfeasors. N.J.S.A. 2A:15-5.1 to -5.8. The court should mold the verdict based on the findings of the trier of fact. N.J.S.A. 2A:15-5.2(d). If a tortfeasor is found to be sixty percent responsible for damages, the injured party may recover full damages from that person. N.J.S.A. 2A:15-5.3.

In Blazovic, the issue before the Supreme Court was the apportionment of liability among a restaurant, plaintiff, and tortfeasors who had attacked plaintiff in the restaurant parking lot, where the lighting was dim because of the restaurant's negligence. 124 N.J. at 106-12 (1991). The Supreme Court held that the apportionment of liability should include the proportion of fault among intentional and negligent tortfeasors, id. at 107, but recognized that apportionment of fault can be precluded between two tortfeasors "when the duty of one encompassed the obligation to prevent the specific misconduct of the other." Id. at 111.

In Grubbs, we noted that a negligent attorney was responsible for the reasonable legal expenses and attorney's fees incurred by a former client in prosecuting a legal malpractice action. 376 N.J. Super. at 431. There was no requirement of proportionality between the damages recovered and the fees awarded. Id. at 432. Nevertheless, the amount a plaintiff recovers in damages is a relevant factor in determining whether the fees sought are reasonable. Ibid. Also, legal malpractice cases are not an exception to the rule enunciated in Blazovic pertaining to the apportionment of fault. Id. at 442.

Plaintiffs argue that pursuant to Blazovic, there should have been no apportionment of liability because defendant's neglect of his duties was the

lynchpin that caused the siphoning of decedent's estate. We disagree. Although defendant deviated from accepted standards of care, Jennifer, an intentional tortfeasor, depleted the estate. Therefore, pursuant to Blazovic, apportionment of liability was appropriate.

Plaintiffs further argue that there should have been no apportionment because all the defendants were jointly and severally liable and were involved in a joint enterprise. Alternatively, plaintiffs argue there should be a new trial on allocation. In light of our decision that the claim for breach of fiduciary duty was improperly dismissed, it is impossible to know the allocation of liability that would have been imposed by the jury, had it considered the fiduciary duty claim. Thus, the issue of allocation will be addressed at the retrial.

V.

Defendants argue that the judge erred in denying their motion for involuntary dismissal pursuant to Rule 4:37-2(b), in denying their motion for judgment pursuant to Rule 4:40-1, and in denying their motion for JNOV pursuant to Rule 4:40-2. On September 1, 2016, the judge denied defendants' motion for JNOV. On July 7, 2017, nunc pro tunc to April 20, 2016, the judge denied defendants' motions for involuntary dismissal and for judgment.

The standard for granting a JNOV under <u>Rule</u> 4:40-2 and a directed verdict under <u>Rule</u> 4:40-1 is the same as that governing the determination of a motion for involuntary dismissal under <u>Rule</u> 4:37-2(b), namely that the court must accept as true all the evidence which supports the party defending against the motion and must give all legitimate inferences to that party. We apply the same standard as the trial court. <u>Boyle v. Ford Motor Co.</u>, 399 N.J. Super. 18, 40 (App. Div. 2008).

Defendants argue that the judge should have dismissed the legal malpractice claim because plaintiffs did not represent decedent or the estate, and Eustler never filed a complaint on behalf of the estate, but as we already stated, Eustler authorized plaintiffs to bring the malpractice action on behalf of the estate. Therefore, defendants' argument is devoid of merit. A personal representative may ratify and accept acts on behalf of the estate done by others where the acts would have been proper for a personal representative. N.J.S.A. 3B:10-20. Here, Eustler's assignment of rights was proper and defendants were notified of it. Plaintiffs were authorized to bring the malpractice action on behalf of the estate, and the legal malpractice claim shall stand.

Defendants argue that Begley's opinion went beyond the recognized legal standard in New Jersey, and his opinion was "untenable," as discussed in

Cellucci. 277 N.J. Super. at 506. In Cellucci, the court found the expert's opinion untenable when the expert opined that the lawyer was liable for an exercise of poor judgment, even though the lawyer had not deviated from the standard of care of an attorney. Id. at 522. The court held that an error in judgment does not constitute malpractice. Ibid.

Here, had defendant met with decedent and judged her to be competent, or not unduly influenced, that would have constituted an error in judgment, but might not have supported a claim for malpractice. Instead, defendant took no steps whatsoever to determine decedent's competency or whether she was unduly influenced. Thus, it is not his judgment that is at issue here, but his failure to comply with the standard of care of an estate attorney.

We disagree with defendants' characterization of Begley's opinion. He cited numerous RPCs that indicated defendant failed to comply with the standard of care, as well as defendant's own testimony that defendant generally complied with this standard, but failed to do so with decedent. Instead, Begley's opinion was that defendant failed to take the basic steps to insure that decedent had capacity, was not unduly influenced, understood the changes to her estate plan and that the documents were properly executed.

Defendants cite Villanueva v. Brown, 103 F.3d 1128 (3d Cir. 1997), for the notion that where a notary is involved, there can be no liability for the attorney. But here, defendant's liability was not solely based upon the fact that he did not supervise the execution of the documents.

VI.

We next address defendant's arguments relative to the plaintiffs' legal malpractice claim. Defendants argue that because they owed no duty to plaintiffs, the judge erred in denying their motion for judgment on this issue. We disagree.

"[A]n attorney is obligated to exercise that degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise." St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden, 88 N.J. 571, 588 (1982). In representing a client, an attorney impliedly represents that (1) he or she possesses the requisite degree of learning, skill, and ability which others in the profession ordinarily possess; (2) he or she will use his or her best judgment in representing the client; and (3) he or she will exercise reasonable and ordinary care and diligence. Ibid.

To present a prima facie legal malpractice claim, a plaintiff must establish the existence of an attorney-client relationship creating a duty of care by the

attorney, breach of that duty and proximate causation of damages. Jerista v. Murray, 185 N.J. 175, 190-91 (2005). Proximate cause is established by showing that the negligent conduct was a "substantial contributing factor" in causing damages. Lamb v. Barbour, 188 N.J. Super. 6, 12 (App. Div. 1982).

An attorney owes a duty to a client identified in the retainer agreement. RPC 1.2. However, whether a duty exists to a third party depends on a balancing test between the attorney's duty to vigorously represent a client and the duty not to provide misleading information that others may foreseeably rely upon. Estate of Albanese v. Lolio, 393 N.J. Super. 355, 368 (App. Div. 2007). "To determine if a duty exists, the court conducts an 'inquiry [that] involves weighing the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.'" Id. at 369 (alteration in original) (quoting Barner v. Sheldon, 292 N.J. Super. 258, 261 (Law Div. 1995)). "The primary question is one of fairness." Ibid. Privity is not necessary between an attorney and a non-client "where the attorney had reason to foresee the specific harm which occurred." Id. at 368-69 (quoting Albright v. Burns, 206 N.J. Super. 625, 633 (App. Div. 1986)).

"The absence of an attorney-client relationship does not necessarily bar a legal malpractice claim by a non-client where an independent duty is owed."

Fitzgerald v. Linnus, 336 N.J. Super. 458, 468 (App. Div. 2001). For example, a lawyer may have a duty to a beneficiary when a duty has been undertaken, or where egregious circumstances exist. Barner, 292 N.J. Super. at 266. But when "a beneficiary's interest is adversarial to the interest of the estate and contrary to the Will of the testator, then no such duty shall be imposed upon the attorney." Ibid.

Fitzgerald and Barner involved claims that the attorney was remiss in administering an estate by failing to tell the clients to disclaim part of the decedents' estates for tax purposes. Both courts agreed that post-mortem tax planning for the benefit of the executor of the estate was not included in the retainer for drafting the decedent's Will. Fitzgerald, 336 N.J. Super. at 473; Barner, 292 N.J. Super. at 260-61, 266.

Some states preclude a beneficiary of the Will from asserting a malpractice claim against the drafter of the Will based on a lack of privity between the lawyer and the non-client beneficiary. Pivnick v. Beck, 326 N.J. Super. 474, 482 (App. Div. 1999). Others permit malpractice claims by beneficiaries if the attorney's professional negligence resulted in a frustration of the testamentary intent expressed in the Will, or permit recovery only on negligence or third-party beneficiary theories. Id. at 482-83.

Defendants argue they had no duty to plaintiffs because they never signed a retainer agreement with them and the court should have granted summary judgment. The judge determined that defendant had a duty to plaintiffs, given that they were the beneficiaries of decedent's estate up until the point that defendant aided decedent in changing her estate plan. Giving all favorable inferences to plaintiffs, the judge accepted plaintiffs' argument that defendant had deviated from the standard of care by: failing to properly identify decedent as the person expressing the desire for a change to her estate plan; abrogating his responsibilities to McGlinchey to compile decedent's asset portfolio, to determine the bequests and to distribute assets; failing to review documents with decedent to make sure she understood what she was doing; and failing to evaluate decedent to make sure she was competent and not unduly influenced. The experts disagreed about whether defendant owed a duty to plaintiffs. The jury ultimately found that defendant had a duty to plaintiffs and he deviated from the accepted standards of legal practice.

Even though defendant did not sign a retainer agreement with plaintiffs, the judge properly denied summary judgment on the question of whether he had a duty to plaintiffs. A testator intends his or her attorney to protect the interests of beneficiaries of his or her estate. Restatement (Third) of The Law Governing

40

Lawyers § 51 (Am. Law Inst. 2000). As beneficiaries of the estate, plaintiffs were entitled to rely on defendant to comply with the standards of the profession. The record supports a finding that defendant failed to meet the standards of the legal profession inasmuch as he never met with decedent, did not ascertain that she had capacity to change her estate plan and was not unduly influenced, was not sure that the person he spoke with on the phone was her, and did not supervise the execution of testamentary documents or explain to decedent the nature of the documents.

The test of testamentary capacity is whether a person can comprehend his or her property, the objects of his or her bounty, the meaning of the business that he [or she] is engaged in, and the relationship of these factors to the others and the manner of distribution set forth in the Will. In re Will of Liebl, 260 N.J. Super. 519, 524 (App. Div. 1992). Capacity should be tested on the date the Will is executed. Ibid. Whether an attorney has complied with a standard of care is a fact question for the jury. Cellucci, 277 N.J. Super. at 524.

Defendants cite Barner and Fitzgerald for the proposition that an attorney who drafts a Will does not owe a duty to beneficiaries of the Will. But, those cases are distinguished because they addressed whether the attorney's obligation extended to post-mortem tax planning. Fitzgerald, 336 N.J. Super. at 473;

<u>Barner</u>, 292 N.J. Super. at 260-61, 266. Here, plaintiffs were not requesting post-mortem services, and they expected defendant to comply with the standards of care of an estates attorney by ascertaining that decedent had capacity to change her estate plan, was not unduly influenced and understood the changes she was making.

Defendants cite three unpublished cases to support their argument that they had no duty to plaintiffs. An unpublished opinion does not constitute precedent nor is it binding upon the appellate court. <u>R.</u> 1:36-3. "The rule does . . . permit unpublished opinions to be called to" a court's attention as secondary research. <u>Falcon v. Am. Cyanamid</u>, 221 N.J. Super. 252, 261 n.2 (App. Div. 1987) (quoting <u>R.</u> 1:36-3).

Defendants cite <u>Torban v. Obermayer Rebmann Maxwell & Hippel</u>, No. A-3660-05 (App. Div. June 27, 2007) (slip op. at 3-5), where the plaintiff was the executor of his parents' Wills and he sued the scrivener for malpractice, claiming that he paid higher estate tax because of the attorney's negligence. The court held that the attorney-client relationship terminated at the point that the decedents executed their Wills, especially given that they had rejected the attorney's advice about tax planning. <u>Id.</u> at 6-7. <u>Torban</u> is not on point because the claimed malpractice in that case involved liability for additional estate taxes,

42

but the defendants had refused to follow the scrivener's tax advice.  Ibid.  Here, the liability is based upon defendant preparing testamentary documents for a testator without complying with the standard of care for estates attorneys.

Defendants also cite to Holvenstot v. Nusbaum, No. A-2987-08 (App. Div. Sept. 21, 2010) (slip op. at 2-6), where a court, in a guardianship action, determined the testator was competent to manage her affairs and the testator changed her Will to disinherit her son.  After the testator's death, the son sued the attorney scrivener for malpractice.  Ibid.  The court held that the attorney's duty was not as to the potential beneficiary, but to the testator who had been adjudicated competent.  Id. at 6-10.  Holvenstot is distinguishable because here, the proofs showed decedent was not competent to change her estate plan when defendant drafted her testamentary documents.

Defendants cite to Taffaro v. Connell, No. A-4928-09 (App. Div. Sept. 30, 2011) (slip op. at 3-5), where shortly after being adjudicated as competent by the court, the testator disinherited her stepson.  The court held that the attorney's duty was only to the testator and not the potential beneficiary when he prepared a Will "in accordance with her expressed intention."  Id. at 7-8. Once again, this case can be distinguished because decedent here was not competent to express her intention as to her estate plan.

Defendants argue that their expert, Henkel, relied on <u>Albanese</u> to find no duty and that plaintiffs' expert, Begley, could cite no New Jersey case law to support his opinion that defendants owed a duty to plaintiffs. We disagree because Begley cited numerous RPCs and MRPCs and expressed opinions accepted by the jury as to the standard of care applicable to an estate attorney.

> While violations of ethical standards do not per se give rise to tortious claims, the standards set the minimum level of competency which must be displayed by all attorneys. Where an attorney fails to meet the minimum standard of competence governing the profession, such failure can be considered evidence of malpractice.
>
> [<u>Albright</u>, 206 N.J. Super. at 634 (citations omitted).]

Begley also cited <u>Rothblatt</u>, a federal case that applied New Jersey law and numerous cases from other jurisdictions that supported the notion that an attorney may be sued for professional malpractice by beneficiaries of an estate who have suffered a loss from the attorney's negligence even though they were not in privity with the attorney. In addition, Begley cited the <u>Restatement (Third) of The Law Governing Lawyers</u> § 51 (Am. Law Inst. 2000), stating that lawyers have a duty to a non-client when the lawyer knows that a client intended the lawyer's services to benefit a non-client. Begley described the importance of an attorney overseeing the execution of documents as evidenced by the

American College of Trust and Estate Counsel Foundation (ACTEC), and he noted that it would have been relatively simple for defendant to ascertain that decedent had no capacity, and did not even know the names of her children, but defendant made no attempt to learn this information. Therefore, Begley provided a sufficient basis to support his expert opinion and defendants' argument is devoid of merit.

VII.

Next, we address the issue of counsel fees. In their appeal, defendants argue that the judge erred in not awarding fees to them since plaintiffs did not prevail on all of their claims and they only recovered $61,000 in damages. Plaintiffs argue that the fees awarded were appropriate but they should not have been allocated because defendants should have been responsible for all of the fees. Because we are remanding the matter for a new trial, the counsel fee award is reversed and the judge will consider the issue of counsel fees after the conclusion of the new trial. We add the following comments.

The judge considered the statutory factors and awarded fees in the amount of $534,756.19 to plaintiffs and denied fees to defendants. The judge made the following findings: the time plaintiffs' counsel spent was reasonable; the matter involved extensive discovery, motion practice and knowledge of numerous legal

issues; the hourly rates plaintiffs' counsel requested, i.e., $300 per hour, were reasonable; the result obtained was the recovery of $244,000 in damages, but involved the expenditure of approximately $1.7 million in costs and fees; plaintiffs' counsel spent seventy-one percent of their time litigating against defendants who were responsible for only twenty-five percent of the damages, and only twenty-nine percent of their time litigating against Jennifer and the financial defendants; the disparity in the amount recovered relative to the fees and costs expended was the "overriding factor in reducing the fee award sought by plaintiffs." The judge also found Eustler's delegation to plaintiffs the claims of the estate supported fee shifting pursuant to Saffer v. Willoughby, 143 N.J. 256, 260 (1996); fees should be apportioned pursuant to Grubbs; the award of $534,756.19 included twenty-five percent of the total fees and costs expended up until trial, plus one hundred percent of the time devoted to litigating against defendants after trial; plaintiffs were not entitled to a fee enhancement; defendants were not entitled to fees pursuant to the offer of judgment rule; plaintiffs' fees as of April 2016 totaled $1,743,116.

An award of counsel fees is discretionary with the court and will not be reversed absent a demonstration of manifest abuse of discretion. In re Prob. of Alleged Will of Landsman, 319 N.J. Super. 252, 271 (App. Div. 1999). New

A-4675-16T3

Jersey abides by the American Rule that parties are responsible for their own attorney fees, except for specific situations enumerated in Rule 4:42-9. For example, an award of attorney's fees is permitted for the following types of actions: family, out of court fund, probate, mortgage foreclosure, tax certificate foreclosure, liability or indemnity policy of insurance, and as expressly provided by rules where attorney's fees are permitted by statute. R. 4:42-9(a).

In In re Estate of Vayda, 184 N.J. 115, 121 (2005), the Court discussed New Jersey's limited exceptions to the American Rule. For example, Saffer permitted a legal malpractice plaintiff to recover, as consequential damages, the attorney's fees incurred in prosecuting the malpractice action against a negligent attorney. 143 N.J. at 271-72. Packard–Bamberger & Co. v. Collier, 167 N.J. 427, 443-44 (2001), extended the exception to include actions for attorney misconduct, such as breach of a fiduciary duty, so long as the attorney's breach arose from the attorney-client relationship. In In re Estate of Lash, 169 N.J. 20, 26-27 (2001), our Supreme Court held that if a plaintiff was forced because of the wrongful conduct of a tortfeasor to institute litigation against a third party, the plaintiff can recover the fees incurred in that litigation from the tortfeasor. However, the Court specifically limited its holding to cases of attorney breach of fiduciary duty, explaining "that the fact that a person owes another a fiduciary

duty, in and of itself, does not justify an award of fees unless the wrongful conduct arose out of an attorney-client relationship." Id. at 34.

In In re Niles Trust, 176 N.J. 282, 296-99 (2003), our Supreme Court held that when an executor or trustee commits the "pernicious tort" of undue influence, it should result in an award of all reasonable counsel fees and costs. In DiMisa v. Acquaviva, 198 N.J. 547, 553-54 (2009), the Court permitted an attorney fee to be recovered by a party required to litigate as a result of a third-party's tort. In Innes v. Marzano-Lesnevich, 224 N.J. 584, 598 (2016), the court permitted fees to a non-client for an attorney's intentional breach of a fiduciary duty, reaffirming past precedent.

The first step in the analysis of an attorney's fee award is for the court to determine the lodestar, which is the appropriate hourly fee multiplied by the number of hours that were reasonably expended. Rendine v. Pantzer, 141 N.J. 292, 334-35 (1995). Hours that are "excessive, redundant, or otherwise unnecessary" should be excluded. Id. at 335 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). The court may also reduce the lodestar "if the level of success achieved in the litigation is limited as compared to the relief sought." Id. at 336. The court is required to make findings on each element of the lodestar fee. See R.M. v. Supreme Court of N.J., 190 N.J. 1, 9-11 (2007).

RPC 1.5(a) provides that the following factors pertain to whether an attorney fee is reasonable: the time and labor required; the novelty and difficulty of the questions involved; the skill requisite to perform the legal service properly; whether acceptance of the employment precluded other employment by the lawyer; the fee customarily charged in the locality for similar legal services; and the amount involved and the results obtained.

Defendants argue the award of fees is contrary to the holding in Innes that a counsel fee may only be awarded to a non-client in a legal malpractice matter upon a finding that the attorney intentionally breached a fiduciary duty to the non-client. 224 N.J. at 597-98. Defendants claim they had no fiduciary duty to plaintiffs and the court dismissed plaintiffs' breach of fiduciary duty claims, so an attorney fee should not have been awarded.

But the court did not base its award of fees on an intentional breach of fiduciary duty as was discussed in Innes. Rather, the judge held that fee-shifting was permitted under Saffer, because plaintiffs essentially stepped into the shoes of the estate and the estate delegated its claims to plaintiffs, and as a result, plaintiffs could recover against defendants for their negligent representation of decedent.

We note that the estate never filed a complaint. Nevertheless, Eustler allowed plaintiffs to represent the estate at their sole "risk and expense" and defense counsel never objected to the estate being included as a nominal plaintiff. The judge accepted Eustler's representation that plaintiffs brought the claims on behalf of the estate. As noted, N.J.S.A. 3B:10-20 provides that a personal representative may ratify and accept acts on behalf of the estate that were done by others. The judge was correct by determining that plaintiffs stepped into the shoes of the estate. According to Saffer, a negligent attorney is responsible for reasonable attorney's fees incurred by a former client in prosecuting a legal malpractice action. 143 N.J. at 272. Thus, had the estate filed a complaint for legal malpractice, defendants might have been liable for fees.

Defendants claim that the judge erred in finding this case similar to Niles because there, the executor and the trustee were negligent, but not the attorney, and that case did not include a claim for malpractice, but rather for undue influence. The judge compared this matter to Niles, inasmuch as the tortfeasors in that case gained complete control over the estate both before and after the decedent's death, and, here, Jennifer was also able to accomplish this; in Niles a former beneficiary of the estate brought the action and that occurred here as

well; and in <u>Niles</u> as well as here, tort-based damages were sought. The judge duly noted that but for the actions of plaintiffs, no one else would have filed the complaint, because the estate would have been completely depleted if it had filed the complaint. In any event the court relied on <u>Saffer</u>, and not <u>Niles</u>, in awarding fees.

Defendants distinguish <u>Lash</u> because that case involved misappropriation of assets by an estate administrator where the defendant was not an estate administrator. 169 N.J. at 26. <u>Lash</u> stands for the proposition that one, who through the tort of another, is required to litigate to protect his interests, is entitled to recover reasonable attorney's fees from the tortfeasor. <u>Ibid.</u>

Defendants take issue with the amount of the court's award, given that the court awarded $534,756, but defendants' responsibility for damages was only $61,000, citing <u>Szczepanski v. Newcomb Med. Ctr., Inc.</u>, 141 N.J. 346, 366 (1995), for the proposition that when fees are disproportionate to the damages, the court must carefully review the application. Defendants question numerous entries in the billings, such as those from associate Susan Carpenter, who billed at $175 and eventually $225 per hour: she appears to have billed on October 17, 2008, for drafting or researching a "new Will"; researched two cases for 3.5 hours; on three separate days in January 2009, she spent 3.75, 5.75 and 5.40

hours drafting interrogatories and modifying interrogatories responses; she spent an hour sending out interrogatories; she spent 4.25 hours researching insurance and securities issues; and in March 2009, she spent 4.2 and 1.75 hours amending a complaint.

The judge noted that attorney's fees should not be awarded for most of plaintiffs' claims against defendants, including fraud, conspiracy, injunctive relief and punitive damages, because those claims were not intended to make the estate whole. But because of the thousands of billing entries, the judge concluded that it could not separate out the claims where attorney's fees would be permitted. Instead, the court awarded fees pursuant to <u>Grubbs</u>, i.e., defendants were responsible for twenty-five percent of the fees expended in preparation for trial, in conformity with defendants' allocation of liability, and one-hundred percent of the fees incurred after trial because the other defendants did not participate in the post-trial litigation.

The judge stated:

> This court has great difficulty questioning the legitimacy of the entries of tasks and time presented by plaintiff[s'] counsel. There is no way this court knows to question whether counsel spent [one] hour or [two] on a particular task. From its review the itemization of tasks appear to be necessary to litigating the multiple and varied claims against defendants. The time, though high, appears to be within reason for the task, and the

tasks appear to be necessary for the litigation. While it is clear that plaintiff[s'] counsel allowed no stone to be unturned (perhaps two or three times), it is no easy task for this court to take what are literally thousands of entries and second guess their veracity. This court has accepted the entries for purposes of the lodestar review.

Defendants also argue that because plaintiffs only recovered $61,000, the judge should have awarded fees to them pursuant to the offer of judgment rule. Defendants contend that they made an offer of judgment to plaintiffs for $244,000, but plaintiffs refused the offer and the jury ultimately found that defendants were only liable for damages of $61,000. According to defendants, plaintiffs were not successful in recovering from defendants seventy-five percent of their losses, or $195,200. Thus, defendants argue that they were entitled to fees under the offer of judgment rule.

The offer of judgment rule provides that when a party makes an offer to a claimant, and the claimant rejects the offer, and thereafter, the party obtains a favorable monetary judgment, the party is entitled to attorney's fees. R. 4:58-3. However, no attorney's fee shall be permitted when: the claimant's claim is dismissed; a no-cause verdict is returned; only nominal damages are awarded; a fee allowance would conflict with a statute or court rule; or an allowance would impose undue hardship. R. 4:58-3(c). A plaintiff asserting multiple defendants are jointly and severally liable is not subject to the financial consequences of

Rule 4:58-3 for rejecting an offer by a single defendant to settle its share of liability. Schettino v. Roizman Dev., Inc., 158 N.J. 476, 484 (1999).

Here, defendants' offer of judgment for $244,000 included damages, costs and fees, and plaintiffs' fees totaled more than one million dollars, significantly higher than the offer of judgment made by defendants.

In their cross-appeal, plaintiffs argue that fees were appropriate but they should not have been allocated. Plaintiffs argue that the jury found a joint enterprise existed and defendant should therefore have been liable for all of the fees. Plaintiffs also argue that the judge's findings were inadequate because their detailed description of the work performed by each attorney was not considered. Plaintiffs also argue that the judge wrongly labeled their efforts as partially successful, when in fact, they successfully obtained an award pursuant to the New Jersey Consumer Fraud Act against the financial defendants, and recovered assets in the probate proceeding. We note that plaintiffs recovered assets of the estate, but they also pursued claims against defendants that were unsuccessful, such as civil conspiracy and fraud.

Plaintiffs argue that the amount recovered was not disproportionate to the fees requested because the assets brought back into the estate ($256,298), plus the $61,000 (defendants' share of the liability to the estate), plus the attorney's

fees award ($534,769), totaled $852,067 ($256,298 plus $61,000 plus $534,769 = $852,067), or one-half of the $1.7 million in attorney's fees requested. The attorney's fees that were already awarded by the probate court in retrieving assets to the estate was approximately $156,000. Following the new trial, the judge shall consider all of these issues anew as well as the issue of allocation of fees, which will abide the proofs and percentages of liability, if any, apportioned by the jury.

Finally, in their cross-appeal, plaintiffs argue that the judge erred when denying their motion for summary judgment with respect to the retainer agreement and argue that the agreement should have been void as a matter of law. We disagree because that is a fact question for the jury.

Plaintiffs argue that RPC 1.0 requires informed consent after an attorney has explained the risks and alternatives to a proposed course of conduct. Plaintiffs further argue that the retainer agreement was signed before defendant ever spoke with decedent, and therefore, defendant could not have obtained her informed consent, making the retainer agreement null and void because decedent was incapacitated at the time it was signed on July 31, 2007. The judge correctly found that this was a fact question for the jury and the proofs at trial were necessary to make a determination.

We conclude that the remaining arguments—to the extent we have not addressed them—lack sufficient merit to warrant any further discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Reversed and remanded for a new jury trial and further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION